RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0231p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LOIS KRAMER, M.D.,

        *Plaintiff-Appellant,*

    *v.*

No. 07-1552

PAUL REVERE LIFE INSURANCE COMPANY
and PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY,

        *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-74362—Robert H. Cleland, District Judge.

Argued: June 5, 2008

Decided and Filed: April 8, 2009[*]

Before: DAUGHTREY, CLAY, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Larry W. Bennett, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellant. Stephen L. Witenoff, THOMAS, DeGROOD & WITENOFF, P.C., Southfield, Michigan, for Appellees. **ON BRIEF:** Larry W. Bennett, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellant. Stephen L. Witenoff, THOMAS, DeGROOD & WITENOFF, P.C., Southfield, Michigan, for Appellees.

_____

## OPINION

_____

    MARTHA CRAIG DAUGHTREY, Circuit Judge**.** The plaintiff, Dr. Lois Kramer, initiated this ERISA action against defendants Paul Revere Life Insurance Company and

---

[*] This decision was originally issued as an "unpublished decision" filed on April 8, 2009. On June 30, 2009, the court designated the opinion as one recommended for full-text publication.

Provident Life and Accident Insurance Company, claiming wrongful termination of long-term disability benefits and seeking reinstatement of benefits under policies issued by the defendants. Applying *de novo* review to Provident Life's determination that the plaintiff was no longer disabled, the district court found that "Plaintiff's condition preclude[d] her from performing the material and substantial duties of her own occupation" and thus concluded that she was entitled to continue receiving payments under that policy. However, after reviewing Paul Revere Life's decision under the arbitrary-and-capricious standard, the district court upheld the cessation of benefits by that company based on the same medical record. The plaintiff now appeals the latter ruling. Because the record establishes that Dr. Kramer was disabled under the terms of the Paul Revere Life policy, which were virtually identical to those in the Provident Life policy, we conclude that the plan administrator's decision to terminate benefits was arbitrary and capricious. We therefore reverse the district court's ruling in favor of defendant Paul Revere Life.

### FACTUAL AND PROCEDURAL BACKGROUND

Both of the insurance policies at issue in this case provide long-term disability benefits in the event that the insured becomes "totally disabled." That term is defined by the Provident Life policy as "not able to perform the substantial and material duties of *your occupation*" and by the Paul Revere Life policy as "unable to perform the important duties of *his own occupation* on a full-time or part-time basis." (Emphasis added.) The Provident Life policy had been provided to the plaintiff by her employer, the Henry Ford Health System, where she was employed as a staff physician specializing in obstetrics and gynecology (ob/gyn). Through her employer, Dr. Kramer purchased the additional long-term disability benefits policy from Paul Revere Life. The two insurers were separate companies at the time that the policies were issued but later merged, first with each other and then with Unum Life Insurance Co. Thus, they were both part of UnumProvident Corporation at the time that payments to the plaintiff were terminated in this case, and the same adjusters made the decision to stop payment under both policies. For that reason, they will be referred to in this opinion, as in the district court's opinion, as "the defendant" or as "Unum."

The difference in the district court's standard of review of the termination decisions stemmed from the fact that the Provident Life policy did not explicitly vest the plan administrator with discretion regarding the grant or denial of benefits, thus subjecting the decision to terminate payments to *de novo* review by the district court. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In contrast, the district court construed the Paul Revere Life policy as conferring discretion on the plan administrator and, therefore, utilized the more deferential standard that allows reversal of a termination decision only if that determination was arbitrary and capricious. *See*, *e.g.*, *Bartling v. Fruehauf Corp.*, 29 F.3d 1061, 1071 (6th Cir. 1994).

As detailed in the district court's opinion, the administrative record indicates that Dr. Kramer began suffering from cervical pain as early as 1987, when she evidently had the first of a series of computed tomography (CT) scans. She underwent physical therapy in January 1989, in an attempt to relieve pain in her neck and right arm that was forcing her to interrupt patient exams, forego surgery, and take various medications, including – at night – Vicodin and Flexeril. A magnetic resonance imaging (MRI) in 1995 showed central disk herniation at the C4-C5 level, causing mild compression of the left side of the spinal cord and mild-to-moderate spinal stenosis at the C5-C6 level. A CT scan later that year led to surgery, a C6-C7 laminectomy that was accomplished on December 12, 1995.

Despite the surgery, the plaintiff continued to experience pain that interfered with her work, and subsequent CT scans and MRI x-rays showed "chronic left C8 raduiculopathy with mild ongoing denervation." Dr. Kramer was noted to be suffering "weakness in the biceps, brachial radialis, triceps, and finger extensions of the left hand." She underwent nerve root injections in May 1997 but continued to suffer pain that, according to two different physicians, interfered with her professional responsibilities. As a result, Dr. Kramer stopped working on September 1, 1997, while continuing to seek medical and therapeutic relief from her symptoms and continuing to take Vicodin to control pain. When none of the treatments restored normal use of her left arm, Dr. Kramer applied for disability benefits in the fall of 1998, based on the assessment of her treating physician that with her limitations, she "can't deliver babies, can't do surgeries, can't perform multiple pelvic exams or colposciopies." Her supervisor informed an investigator for the defendant that, given

those limitations, there was no work available to the plaintiff at the Henry Ford Health System.

The plaintiff's application for benefits was approved by the defendant in late 1998. In June 1999, her interim medical records were reviewed by the defendant's internal consultant, Dr. Paul Martin, who reported that "[i]t would appear that since 9-97 th[e] claimant's abilities have steadily gone downhill rendering her totally incapable of performing any ob/gyn practice and procedures." She was taking Vicodin twice daily, and the dosage was increased after September 1999. In May 2000, she was having increasing difficulties with the discomfort in her left arm and was prescribed a Fentanyl patch, which delivered an opioid pain-killer transdermally. She was subsequently seen by a neurologist, who ordered another MRI and discovered that, in addition to narrowing at C5-C6 and C6-C7, Dr. Kramer had developed a bone spur at the site of her laminectomy that "protrude[d] posterior into the left, abutting the spinal cord." He concluded in his report that because Dr. Kramer had experienced little or no relief from the laminectomy performed in 1995, she was unwilling to undergo further surgery without a guarantee that it would improve her condition, which – the neurologist noted – no doctor could give her.

Another internal review of Dr. Kramer's file ordered by the defendant in April 2001 produced a report by a Dr. Barbara Parke that there was sufficient objective medical information to support the plaintiff's claim for disability benefits. Dr. Kramer continued to undergo regular medical check-ups, and an MRI in June 2002 showed no change in her condition, although she did report that her fingers had begun feeling numb. The defendant set up an additional independent medical evaluation in the fall of that year, but there is no copy of the resulting report in the record, an omission the defendant said was "due to physician negligence." However, there is also no indication in the record that company officials made any effort to secure a copy of the report. A year later, in June 2003, Dr. Lois underwent another independent medical exam at the defendant's direction. In the resulting report – the first to reflect a radical departure from previous medical diagnoses – a Dr. Phillip Mayer concluded that the plaintiff "did not have any objective abnormalities to suggest ongoing cervical radiculopathy" and noted that he had found "no objective reason why this individual should not be able to perform her functions as a physician in the specialty of obstetrics/gynecology." The defendants sent this report to a Dr. Geron Brown

for an internal review of selected portions of Dr. Kramer's file, including Dr. Mayer's recent report. Brown concluded that "[t]he objective medical findings in the records do support some level of impairment," but he opined that "th[is] impairment is mild and would not be expected to preclude a light physical demand occupation." He further asserted that "[n]o restrictions or limitations for this individual's profession are indicated."

In the meantime, the defendants had set up video surveillance of the plaintiff, watching as she went about daily activities. The initial videotape showed no reason to question Dr. Kramer's disability, but a second series of surveillance videos a year later included views of the plaintiff and her husband working on their sailboat – the defendant said for purposes of winter storage, but the plaintiff later explained that they were readying the boat for sale because she was no longer able to engage in sailing. Based on the second videotape and the reports from Drs. Mayer and Brown, Unum informed the plaintiff that there were concerns about her entitlement to continued disability benefits. In response, the plaintiff submitted the report from her next examination by her neurosurgeon, Dr. Mark Silverman:

> I am concerned about [Plaintiff] returning to work at her previous occupation. I believe that she may be able to perform some of the activities of her regular duties as a gynecologist for a short period of time during the day; however, it would seem to me unlikely that she could continually use her arms throughout the day doing procedures and office work. I do feel that her current symptoms are representative of the underlying cervical disk pathology and spondylosis that is noted on the most recent MRI.
>
> I feel a bigger issue may be the safety of her patients, especially in the operating room with the necessity for her to perform surgery and the substantial duties of her specialty. This is especially in regard to surgical procedures that require traction particularly on the forearms for an extended period of time, which I feel unlikely that she would be able to perform for a prolonged amount of time. Unfortunately, I don't believe that she can return to work in her current status.

A month later, Dr. Kramer saw her rheumatologist, Dr. Lydia Lasichack, who, noting that her patient was taking Vicodin up to three times a day, responded to Dr. Mayer's opinion that she could return to work as follows:

> I do not believe Dr. Mayer fully understands what an OB/GYN doctor must do. It is a two-handed profession. She is using sharp instruments intra-abdominally and intrapelvically, many times through a laparoscope, and

> particularly in something such as with a vaginal approach for a hysterectomy I think that it would be extremely difficult for Dr. Kramer and also extremely dangerous for the patient to have a surgeon who would lose control of the use of her upper extremity at such a time, even with somebody standing by to help in case she ran into trouble. It seems ludicrous to have a doctor on standby to allow Dr. Kramer to do her job and perhaps injure the patient before the standby doctor can get there. I do not see how she can perform the activities related to her job.

Dr. Lasichak conceded that the plaintiff "can do her activities of daily living, but [then] a patient's life is not in jeopardy, nor is there any chance for bodily harm to another human being when she is hanging up her clothing at home."

Dr. Kramer's treating physician sent the reports from Dr. Lasichak and Dr. Silverman to the defendants on December 12, 2003, writing that he hoped that "this will put to rest the inconceivable notion that Lois can return to her practice of OB/GYN." The defendant nevertheless terminated the plaintiff's benefits under both policies less than a week later, saying that because "no statistical studies were done as suggested by the IME provider, we do not feel that Dr. Silverman and Dr. Lasichak's reports provided any additional information to refute our determination regarding your ability to perform your occupational duties as obstetrics/gynecologist."

The plaintiff appealed this decision internally, sending a letter from Dr. William Anderson, her former supervisor and the head of the Henry Ford Hospital Department of Obstetrics and Gynecology. In that letter, Anderson advised the defendants that Dr. Kramer was "unemployable" as an obstetrician/gynecologist and noted that at the time she was forced to quit work, she could not carry out obstetrical maneuvers in the delivery unit, had difficulty in routine office activity, and had begun requesting that her colleagues perform major and minor surgical procedures for her. Dr. Anderson also explained that Dr. Kramer "would also be a potential medical-legal liability and as a result would not be able to obtain medical liability insurance that is a must" in order to practice in her specialty. In addition, two of the plaintiff's former colleagues at the Henry Ford Hospital wrote Unum to explain that Dr. Kramer had not left her employment willingly but because "she could not fulfill departmental work obligations to her patients because of physical limitations" and that she "had reached a point where she was unable to meet the very demanding physical requirements of her profession in the office, in the operating room, and in the delivery

room." Supporting these opinions was the report of rehabilitation consultant Robert Ancell, who concluded that "from a vocational rehabilitation standpoint . . . Dr. Kramer cannot perform the material and substantial portions of her occupation," citing "the extent, duration and precision that she has to use her left extremity that precludes her from performing her job."

Dr. Kramer subsequently underwent another electromyogram (EMG) and another MRI, which resulted in reports indicating that there were no significant changes in her condition since June 2002 except that "[there has been a slight increase in the size of disc bulge or small herniation to the left at C-7 and . . . there is now some deformity on the exiting nerve root sleeve complex." These additional reports were reviewed internally by Dr. David Frank, who opined that they did not "provide clinical assessment findings" to support the physicians' opinion that the plaintiff was "totally unable to work."

One other review was made by an outside consultant hired by the defendants, Dr. Mark Ross, who concluded – somewhat ambiguously – that although the records did not present objective evidence to support the plaintiff's inability to "use the left upper extremity during functional work activities[,] . . . neuropathic pain conditions do not always have objective findings that match the patient's subjective complaints." He also noted that "it would be unfair to completely ignore" the "consistent subjective support of her limitations offered by multiple healthcare providers." He then ended his report with the following observations that call into question his familiarity both with the demands of the plaintiff's ob/gyn practice and with the terms of the Paul Revere Life policy:

> It is unclear to me how much [*sic*] of the tasks with which she has great difficulty represent [*sic*] an integral portion of her more recent work requirements. It is not uncommon for surgeons to change their type of practice over the course of their years in practice.

The plaintiff's appeal was denied in September 2004. This litigation followed.

## *DISCUSSION*

Before this court, the plaintiff raises three grounds upon which she urges us to reverse the district court's determination that the termination of her disability benefits under the Paul Revere Life policy was not an abuse of discretion. In the first, she argues that the

district court erred in denying her motion to permit extended discovery concerning the company's "pervasive conflict of interest" in fulfilling both the role of plan administrator and that of payor. In a related ground, she contends that the district court should have reviewed the defendant's termination of benefits under a *de novo* standard because of that conflict of interest and "other misconduct [that] permeated the decision to terminate." We pretermit discussion of those issues because we conclude that the decision to terminate benefits was an abuse of discretion in light of medical evidence that, as the district court found, undeniably established the plaintiff's total disability, *i.e.*, her inability to perform her own occupation for an indefinite period beginning in 1997 and extending at least though the date of termination in September 2004.

The district court observed that the defendant's adjusters had initially approved the plaintiff's claim for long-term disability benefits based on a finding that she was totally disabled under both policies as a result of her degenerative cervical spine disease and that it was only after making payments for approximately five years that Unum sought to terminate benefits on the ostensible ground that the plaintiff was no longer disabled. Regarding the Provident Life policy, the district court set out a lengthy and detailed recitation of the medical evidence in the administrative record leading up to the determination of disability in October 1998 and the initial post-approval reports submitted by the plaintiff in 1999. The first post-award review of Dr. Kramer's file by the defendant's internal consultant, Dr. Martin, reflected his opinion that "[her] abilities have steadily gone downhill rendering her totally incapable of performing any ob/gyn practice and procedures." Despite this assessment by its own consultant and supplemental reports supplied by the plaintiff that showed, if anything, that her condition was gradually worsening as time went on, the defendant undertook surreptitious surveillance of Dr. Kramer beginning in 2000, apparently because she had reported that she "went to her cottage and sailed." The initial video surveillance did not, in the district court's words, "reveal any inconsistencies or extreme activity." Another internal review in 2001 by Dr. Parke indicated "sufficient objective evidence" to support the plaintiff's claim. Within the next year, reports submitted by the plaintiff indicated that she had experienced an increase in her discomfort level and a decrease in arm muscle strength and grasp, and MRIs taken during this period showed "no material change," *i.e.*, no improvement in her underlying condition. Nevertheless, the

defendant undertook the additional video surveillance in 2002 that showed Dr. Kramer helping her husband working on their sailboat. Based on this video and his independent medical examination, Dr. Mayer concluded, as noted above, that he could find "no objective reason why [the claimant] should not be able to perform her functions as a physician" and also that "[r]eview of the surveillance tape reinforces the fact that she is capable of strenuous activities and performing the duties" of an ob/gyn physician. It was based primarily on Dr. Mayer's report that the defendant terminated the plaintiff's benefits, concluding that she was not disabled under the terms of both policies.

The district court carefully parsed the record, pointing out why the evidence was insufficient to support the denial of benefits under the Provident Life policy. The court noted, for example, that "the usefulness of surveillance," although potentially helpful in some cases in determining the veracity of a claimant's subjective complaints, was "significantly undercut by several factors" in this case. In summary, those factors included the district court's conclusion that what was depicted in the videotapes was not relevant to the duties of an ob/gyn physician in general or to the plaintiff's duties in particular; that there was nothing in the administrative record to raise a doubt about her veracity regarding her reports of disabling pain; that there was objective medical evidence to support those reports, as well as an established history of the need for continuing medication to control her pain; that everyone familiar with her duties at the Henry Ford facility – both her professional colleagues and her treating physicians – were in agreement that she was incapable of carrying out her regular duties there; and that there was no reason in the record to assume bias on their part. The district court might well have added that the record established that the plaintiff's condition had, if anything, *worsened* over the five years that payments were made under the two insurance policies and that there was nothing in Unum's consultants' reports to demonstrate a basis for concluding that her condition had, in fact, *improved* to the extent that she was capable of "strenuous activity," as opined by Dr. Mayer, or for Dr. Brown's conclusion that "no limitations for this individual's profession are indicated." Indeed, those reports are best described as aberrational, given the veritable mountain of contrary medical evidence of Dr. Kramer's disability in the administrative record. Moreover, the comment by another of Unum's outside consultants, Dr. Ross, that "[i]t is not uncommon for surgeons to change their type of practice over the course of their years in

practice" is indefensible insofar as it suggested that because the plaintiff was capable of engaging in work other than her "own occupation" as an ob/gyn physician, she was not disabled under the "own occupation" policies in question.

Given the administrative record in this case, it is easy to understand why the district court came to the conclusion – an inevitable one, in our judgment – that "Plaintiff's condition precludes her from performing the material and substantial duties of her own occupation" and that she "is entitled to disability benefits under the Provident policy." It is also worthy of note that Unum has not appealed the district court's findings in this respect, nor its conclusion that Dr. Kramer met the definition of disability under that policy. What is not so easy to understand is how the district court could come to exactly the opposite conclusion with regard to the Paul Revere Life policy, the difference in the standard of review notwithstanding.

It appears that the court's method of analysis was to focus on the individual factors that Unum considered in reaching its decision to terminate benefits under the second policy, to find that consideration of each of the factors was not arbitrary or capricious, and to conclude that, considering those factors in the aggregate, the decision to deny benefits also could not be considered arbitrary or capricious. In the usual case, such an approach would be appropriate – indeed, it is the method of decision recently approved by the Supreme Court in *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343 (2008). This case, however, is not the usual case, because prior to reviewing the individual aspects of Unum's determination with regard to the Paul Revere Life policy, the district court had already rejected these same factors as a basis for the denial of benefits under the Provident Life policy, finding them irrelevant or arbitrary in light of policy language.

A few examples will suffice to make this point. In assessing the nature of the "substantial and material duties" under the Provident Life policy, the district court opted to "look at the specific descriptions" of the plaintiff's particular job at the Henry Ford Health facility rather than accept outright the description provided for an ob/gyn by the Department of Labor's Dictionary of Occupational Titles, referred to as the DOT. As a result, the district court "relie[d] primarily on the descriptions provided by Plaintiff and her co-workers regarding the duties of an OB/GYN, rather than on the [DOT]" in reviewing the record for

purposes of the Provident Life claim. In contrast, the district court held that it was not arbitrary and capricious for Unum adjusters to argue that under the DOT, the plaintiff's job was merely that of an obstetrician and amounted only to "light work" for purposes of the Paul Revere Life policy.

Likewise, the district court discounted the value of surveillance videotapes in evaluating the claim under the Provident Life policy, concluding that they were irrelevant because the activities depicted in them did not "directly transfer to the duties of an OB/GYN." Reversing itself, the court then held that it was nevertheless "reasonable" for Unum to rely on them in denying benefits under the Paul Revere Life policy.

Finally, with regard to that policy, the district court found that it was not arbitrary and capricious for Unum "to find that Plaintiff's limitations did not preclude her from performing her own occupation . . . based on the surveillance conducted by defendant as well as on the conclusions offered by Drs. Mayer, Brown, Frank and Ross, who opined that there was a lack of objective evidence to support the conclusion that Plaintiff could not perform the duties of an OB/GYN." But this conclusion overlooks the reports of two other Unum physicians, Drs. Martin and Parke, who found that there was objective medical evidence to support Dr. Kramer's complaints of pain. It apparently also completely overlooks the opinions of myriad treating physicians, including Dr. William Sanders, Dr. Richard Silbergleit, Dr. Ghaus Malik, Dr. Russ Nickels, Dr. Ravi Kodali, Dr. Surest Patel, Dr. Maria Pleskacz, Dr. Silverman, Dr. Lois Michelle Butler-Jackson, and Dr. Lasichak, who individually and collectively documented the plaintiff's condition, resulting in a record that shows conclusively that she was experiencing both substantial physical limitations and pain that was controlled only by opioids such as Vicodin, taken on a daily basis. Added to this evidence were the letters from the plaintiff's immediate supervisor and the head of her department certifying unequivocally that she was unable to perform the functions of her "own occupation" and was additionally unemployable because, in her physical condition, she would not be able to secure medical malpractice insurance converage.

Moreover, there is no explanation for the decision to cancel benefits that had been paid for some five years based upon the initial determination of total disability in the absence of any medical evidence that the plaintiff's condition had improved during that time. The

best that can be said of the opinions of Dr. Mayer and the other company consultants is that they support the proposition that Dr. Kramer was, in fact, *never* disabled from her "own occupation." But that conclusion flies in the face of all the other evidence in the record, and the plan administrator's reliance upon it can only be described as arbitrary and capricious.

That the district judge comprehended this reality on some level is seen in his discussion of the surveillance video:

> Defendant principally argues that Plaintiff's activities in preparing her boat for winter storage establish that she could perform heavy work . . . . However, the nature of this activity, closing down a boat, is an infrequent event. It is possible that an individual who suffers from physical limitations could "fight through the pain" for one or two hours in order to accomplish a task which is only rarely necessary. On the other hand, as an OB/GYN, Plaintiff needs to be able to deliver babies or perform surgeries far more regularly, on a weekly or . . . daily basis. While engaged in her OB/GYN duties, it would not be possible for Plaintiff to take pain medication or to take breaks. Further, on the day she worked on her boat, she placed only her own health at risk, but while performing deliveries or surgeries, she was responsible for the life and health of her patients, whether mother, child, or both.

(Footnote omitted.)

We acknowledge that the arbitrary-and-capricious standard of review is highly deferential, requiring the courts to uphold a plan administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health and Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). But, as we have repeatedly noted, "merely because our review must be deferential does not mean our review must also be inconsequential. Although a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). In view of the district court's determination that the evidence established the claimant's total disability in this case under the terms of the Provident Life policy, a ruling that the defendant does not challenge, we conclude that the administrator's contrary decision under the equivalent terms of the Paul Revere Life policy, based as it was on evidence substantially discredited by the district court in reviewing the Provident Life policy, cannot be described as reasoned or principled.

Moreover, we reach this conclusion even without resort to application of the conflict-of-interest analysis recently approved by the Supreme Court in *Glenn*, finding it unnecessary to the resolution of this appeal.

### *CONCLUSION*

For the reasons set out above, the judgment of the district court with regard to the plaintiff's recovery under the Paul Revere Life policy is REVERSED, and the case is REMANDED for entry of judgment in favor of the plaintiff, Dr. Lois Kramer.