RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0041p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ADRIENNE BENNETT,

    *Plaintiff-Appellant,*

   *v.*

KEMPER NATIONAL SERVICES, INC.; LUMBERMENS
MUTUAL CASUALTY COMPANY; BROADSPIRE
SERVICES, INCORPORATED; PLATINUM EQUITY,
L.L.C.,

    *Defendants-Appellees.*

No. 06-2326

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-72357—Julian A. Cook, Jr., District Judge.

Argued: July 25, 2007

Decided and Filed: January 23, 2008

Before: MOORE and COOK, Circuit Judges; ADAMS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Steve J. Weiss, HERTZ SCHRAM, Bloomfield Hills, Michigan, for Appellant. Peter Petrakis, MECKLER, BULGER & TILSON, Chicago, Illinois, for Appellees. **ON BRIEF:** Steve J. Weiss, Derek D. McLeod, HERTZ SCHRAM, Bloomfield Hills, Michigan, for Appellant. Peter Petrakis, Rachel S. Urquhart, MECKLER, BULGER & TILSON, Chicago, Illinois, for Appellees.

  MOORE, J., delivered the opinion of the court, in which ADAMS, D. J., joined. COOK, J. (pp. 9-11), delivered a separate opinion concurring in the judgment.

---

## OPINION

---

  KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Adrienne Bennett ("Bennett") filed an action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Kemper National Services, Inc. ("Kemper"), Lumbermens Mutual

---

[*] The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

Casualty Company ("Lumbermens"), Broadspire Services, Inc. ("Broadspire"), and Platinum Equity, L.L.C. ("Platinum") (collectively "defendants") arguing that the decision to deny her long-term-disability ("LTD") benefits was arbitrary or capricious. The district court granted a judgment in favor of the defendants, and Bennett appealed. Because we conclude that the decision to deny benefits was not the result of a deliberate and principled reasoning process supported by substantial evidence, we **VACATE** the judgment of the district court and **REMAND** with instructions to remand to Broadspire for a full and fair review consistent with this opinion.

## I. BACKGROUND

Bennett was employed as a project manager and master plumber by the Henry Ford Health Systems ("HFHS") until may 23, 2001 when, at the age of 44, she went on disability leave due to multiple sclerosis ("MS") and related conditions.[1] As an HFHS employee, Bennett participated in the HFHS Short and Long Term Disability Plan ("Plan").

The Plan provided for an initial twenty-four months of paid disability if the disability prevented Bennett from performing her own occupation. At the end of the twenty-four months, the Plan paid benefits only if Bennett's disability "prevented [her] from performing the Essential Functions of any Gainful Occupation that [her] training, education and experience would allow [her] to perform." Joint Appendix ("J.A.") at 131 (Plan at 10). At the time that Bennett initially applied for benefits, the Plan was insured by Lumbermens and was administered by Kemper, a subsidiary of Lumbermens.

Bennett's neurologist, Dr. Robert Lisak ("Lisak") wrote a letter explaining that, due to Bennett's MS and respiratory infections, she should be off work indefinitely. Kemper asked neurologist Dr. Gerald Goldberg ("Goldberg") his opinion, and he agreed that the medical records demonstrated that Bennett could not perform her own occupation. After a six-month mandatory waiting period, Kemper approved LTD benefits for Bennett effective November 21, 2001. Kemper also referred Bennett to Allsup, Inc. ("Allsup"), a company specializing in assisting people with their applications for Social Security disability benefits. Kemper informed Bennett that she would not have to pay for Allsup's services, but that any LTD benefits would be reduced by the amount of any Social Security disability benefits that she was awarded.

Lisak examined Bennett on February 13, 2002, finding that she "continued to do poorly, but mainly with depression and cognitive symptoms." J.A. at 261 (Lisak Clinic Note 2/13/02). He recommended that Bennett undergo "neuropsych testing to see how much of the problem is depression, and if there is a significant amount of cognitive problem." J.A. at 262 (Lisak Clinic Note 2/13/02 at 2). In accordance with Lisak's recommendation, on April 3, 2002, Bennett saw Dr. P.A. Keenan ("Keenan") who conducted a series of neuropsychological tests. Keenan noted that Bennett exhibited variable degrees of motivation and effort in the tests, but stated that Bennett's "profile is more suggestive of depression than frank malingering, which was corroborated by objective personality test results. Rather than a conscious attempt to feign cognitive symptoms for monetary secondary gain, [] Bennett has presented as having difficulties adjusting to and accepting the limitations associated with MS." J.A. at 265 (Keenan Rpt. at 3). As the result of Bennett's inconsistent effort, Keenan was unable to determine her neuropsychological status.

On Bennett's visit on May 15, 2002, Lisak noted that her neurologic exam demonstrated "a normal mental status." J.A. at 268 (Lisak Clinic Note 5/15/02). According to Lisak, "[e]verything [was] an effort and seem[ed] to take forever for her to do or answer," but he did not believe it was "a true apraxia." *Id.* It took Bennett 14 seconds to walk 25 feet unassisted.

---

[1] Bennett was originally diagnosed with MS in 1997 while employed by HFHS.

Bennett's next visit to Lisak on November 11, 2002, revealed "an abnormal mental status." J.A. at 270 (Lisak Clinic Note 11/13/02). Lisak noted that he was unable to determine whether Bennett was "showing secondary progression, or whether [it] continue[d] to be her depression." J.A. at 271 (Lisak Clinic Note 11/13/02 at 2). At this visit, it took Bennett 12 seconds to walk 25 feet.

On December 21, 2002, Bennett was admitted to the emergency room for seizures. Bennett was released from the hospital on December 26, whereupon she spent fifteen days in an in-patient rehabilitation program. Her exam upon admission revealed quadriparesis and debility.

Lisak filled out an "Attending Physician's Statement" provided by Kemper on January 8, 2003. He indicated that Bennett's physical impairment was "Class 4. Marked limitation of functional capacity/capable of sedentary work." J.A. at 286 (APS). Bennett's mental impairment was "Class 4 Marked limitation: unable to engage in stress or interpersonal relationships." *Id*. Lisak also indicated that Bennett could sit for only two hours of an eight-hour day and could not continuously stand or walk for any length of time. According to the completed form, Bennett could occasionally lift up to ten pounds and reach above shoulder level, and could never drive an automobile. Lisak indicated that Bennett could not work part-time or full-time.

Bennett's next visit to Lisak on February 5, 2003, revealed a "normal mental status," and an "abnormal gait." J.A. at 276 (Lisak Clinic Note 2/5/03). It took her 28.88 seconds to walk 25 feet. In Lisak's opinion, Bennett had experienced "a full-fledged relapse." J.A. at 277 (Lisak Clinic Note 2/5/03).

By June 25, 2003, Lisak reported that Bennett needed 70 seconds to walk 25 feet, and that she was walking with a cane; however, he also reported that she was "back to driving." J.A. at 282 (Lisak Clinic Note 6/25/03). He also described the results of Bennett's recent MRI scan as showing two new lesions in the hemispheres, with preexisting lesions unchanged or less prominent. The lesion on her cervical spine was more prominent and obvious on T2, but it was not larger and there was no enhancement. Lisak found that Bennett had experienced an unequivocal relapse; however, he wondered whether there might be "psychologic reasons that it seemed to be as severe as it was." J.A. at 283 (Lisak Clinic Note 6/25/03 at 2).

On July 11, 2003, Lisak filled out another "Attending Physician's Statement" provided by Kemper. He again indicated that Bennett's physical and mental impairments were both Class 4; that she could sit for only two hours of an eight-hour day, and could not continuously stand or walk for any length of time; that she could occasionally lift up to ten pounds and reach above shoulder level, that she could never drive an automobile; and that she could not work part-time or full-time.

As the twenty-four month period for own-occupation disability benefits was drawing to a close, Kemper began the process of determining whether Bennett was qualified for LTD under the any-occupation standard. Although the Plan entitled Kemper to require Bennett to submit to a physical examination by a Kemper-approved physician, Kemper instead chose to rely on peer reviews of Bennett's medical files. Both Goldberg and clinical neuropsychologist, Dr. Elana Mendelssohn conducted the initial file reviews in July 2003, and both determined that the records failed to support a finding of a functional impairment that precluded Bennett from working.

Goldberg summarized the Lisak and Keenan files, and concluded that Bennett did have MS and accompanying physical impairments. However, he also found "inconsistencies in her examination." J.A. at 321 (Goldberg Rpt. at 4). According to Goldberg, "[i]n [Lisak's] Attending Physician's Statement he did indicate an impairment that would be consistent with sedentary work. The objective data overall does not indicate a functional impairment that would preclude the claimant from either doing her own job or working at any job, particularly in a sedentary capacity." *Id*. Goldberg indicated that he believed "[r]easonable restrictions and limitations would include not

working at any unprotected heights or driving automotive equipment in the workplace or doing excessive walking or standing." *Id.*

Mendelssohn noted that "Lisak indicated that the claimant's reported relapse in her [MS] had an underlying psychological component," but that Bennett had denied that she was depressed. J.A. at 316 (Mendelssohn Rpt. at 2). Citing the inconclusive results from Keenan's examination of Bennett, Mendelssohn concluded that there was "no recent objective examination findings documenting a severity and intensity of cognitive difficulties that would preclude work," including Bennett's own occupation. J.A. at 317 (Mendelssohn Rpt. at 3).

Relying on the Goldberg and Mendelssohn file reviews, on October 14, 2003, Kemper determined that Bennett was not disabled under the any-occupation standard, and thus, she was not entitled to further LTD benefits after November 20, 2003. The denial letter explained that Bennett could appeal the decision by filing a written request for a review of her claim.

Meanwhile, Bennett's Social Security disability application was percolating. On September 29, 2003, on behalf of Bennett, Allsup wrote a letter containing proposed findings of fact to the ALJ assigned to Bennett's case. On November 7, 2003, the Social Security Administration ("SSA") determined that, because of her MS, as of May 23, 2001, Bennett was disabled within the meaning of the Social Security Act.

Also in 2003 (the record is unclear as to the exact date), Lumbermens sold Kemper to Broadspire, a company independent from Lumbermens or Kemper. J.A. at 672-73 (Notes to Statutory Fin. Statements). Broadspire (which was owned by Platinum) assumed responsibility for administering Bennett's yet-unexhausted claim. *See id.*

In 2004, Bennett supplied Broadspire with additional documentation in support of her appeal. Broadspire commissioned two more file reviews, this time from Dr. Vaughn Cohan ("Cohan") and Dr. Donald Rose ("Rose"). The additional information submitted for review, in Cohan and Rose's opinion, did not support an impairment from November 1, 2003 through November 2004. Neither Cohan's nor Rose's report made any mention of the SSA's finding that Bennett was disabled except to mention the decision in a list of information that they had received.

In a letter dated December 9, 2004, Broadspire informed Bennett that it was upholding Kemper's original determination that Bennett did not satisfy the any-occupation standard for disability. Having exhausted her internal appeals, Bennett filed a complaint against the defendants in state court seeking LTD benefits under ERISA. The defendants removed the case to federal district court and later filed a motion for entry of judgment. Bennett filed a motion to reverse the defendants' administrative decision. On September 29, 2006, the district court entered a judgment in the defendants' favor and against Bennett. Bennett filed a timely notice of appeal on October 11, 2006. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

### A. Standard of Review

We review de novo the district court's judgment on the administrative record. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006). When, as is the case here, the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits, we will reverse the administrator's decision only if it is arbitrary or capricious. *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005). Under this standard, we uphold the administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) (internal quotation marks omitted), *cert. granted*, 76 U.S.L.W. 3017 (U.S. Jan. 18, 2008) (No. 06-923) (cert. granted solely

regarding conflict-of-interest issues). Although this standard is deferential, it "is no mere formality." *Id.* Rather, application of the standard requires us "to review 'the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" *Id.* (quoting *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).

When determining whether a decision was arbitrary or capricious, we also factor in whether there "existe[d] [] a conflict of interest," whether "the plan administrator[] fail[ed] to give consideration to the Social Security Administration's determination that [the applicant] was totally disabled," *id.*, and whether the plan administrator based its decision to deny benefits on a file review as opposed to conducting a physical examination of the applicant. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). Such findings do not change our standard of review, but they do factor into our analysis when determining whether the administrator's decision was arbitrary or capricious. *Id.* (conflict-of-interest context and file-review context); *Glenn*, 461 F.3d at 669 (failure to consider the SSA's determination of disability). We address each of these three factors below.

## B. Conflict of Interest

On appeal, Bennett contends that, although the district court acknowledged a conflict of interest, it failed to give that conflict adequate weight. In contrast, the defendants argue that the district court erred in finding any conflict. Because of our disposition of the case based upon Bennett's other assignments of error, we find it unnecessary to address the parties' arguments regarding whether a conflict of interest existed.

## C. SSA's Disability Determination

Bennett argues that the district court gave inadequate consideration to the fact that Broadspire, in its final benefits determination, failed to discuss the SSA's determination that Bennett was "disabled" under the Social Security Act. Recently, we addressed a situation where the administrator assisted the plaintiff in obtaining Social Security disability benefits, and then, without explanation, determined that for purposes of LTD benefits, the plaintiff was not disabled. This sequence of events raised two overarching concerns:

> [T]he fact that MetLife and the Social Security Administration reached contrary conclusions regarding Glenn's disability status has two ramifications for this appeal. The first stems from the fact that MetLife assisted Glenn in obtaining Social Security benefits and reaped a financial benefit of its own when that assistance was successful. The second issue relates to the fact that, in denying Glenn continuation of her long-term benefits, MetLife failed to address Social Security's contrary determination of Glenn's status.

*Glenn*, 461 F.3d at 667. We further explained in *Glenn* that "an ERISA plan administrator's failure to address the Social Security Administration's finding that the claimant was 'totally disabled' is yet another factor that can render the denial of further long-term disability benefits arbitrary and capricious." *Id.* at 669. We concluded that "[h]aving benefitted financially from the government's determination that Glenn was totally disabled, [the plan administrator] obviously should have given appropriate weight to that determination." *Id.*

Similarly, in the case at bar, Kemper provided Bennett with assistance in obtaining Social Security disability benefits, and under the Plan, was entitled to reduce the amount of benefits it paid to Bennett by the amount Bennett received from Social Security. When Broadspire issued its

decision denying LTD benefits, it failed to explain why it reached a conclusion contrary to that of the SSA.[2]

Conspicuously absent from the district court's discussion on this point is any reference to our *Glenn* decision decided four weeks earlier. Rather, citing an unpublished case, the district court stated that a plan administrator is not required to refer to an SSA disability decision in its own decision denying LTD benefits. The district court also stated that "silence by a plan administrator with regard to a decision by the Social Security Administration does not necessarily mean that it was not considered and evaluated. Furthermore, a plan administrator's decision cannot be considered arbitrary and capricious solely because the Social Security Administration rendered a different decision." J.A. at 64 (Order at 7) (citing *Hurse v. Hartford Life & Accident Ins. Co.*, 77 F. App'x 310, 318 (6th Cir. 2003)). While technically correct, the district court fails to explain further that if the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious. *Glenn*, 461 F.3d at 669.

More importantly, the district court failed to demonstrate, through its application of law to the facts, that it appreciated the gravity of Broadspire's failure to discuss the SSA's disability determination. Instead the district court inquired into whether the defendants "act[ed] maliciously in helping [Bennett] to obtain Social Security disability benefits." J.A. at 69 (Order at 12). This question is irrelevant and demonstrates that the district court did not properly synthesize Broadspire's failure to discuss the SSA disability determination into the arbitrary-or-capricious analysis. We conclude that Broadspire's silence as to the SSA's disability determination weighs in favor of finding that Broadspire failed to engage in a "deliberate, principled reasoning process."[3] *Glenn*, 461 F.3d at 666.

## D. File Review

Bennett also takes issue with the defendants' decision to conduct only a file review. Although "we find nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," *Calvert*, 409 F.3d at 296, "a plan's decision to conduct a file-only review—'especially where the right to [conduct a physical examination] is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.'" *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006) (alteration in original) (quoting *Calvert*, 409 F.3d at 295). In *Calvert*, we were unable to credit the conclusions reached in the file review when the reviewer based his conclusion that the plaintiff was not disabled on adverse credibility determinations and when the reviewer's conclusion stood in direct conflict with objective medical data in the record. *Calvert*, 409 F.3d at 296-97.

---

[2] We note that Broadspire's final determination letter does mention the SSA's decision. However, mere mention of the decision is not the same as a discussion about why the administrator reached a different conclusion from the SSA. In *Glenn* we concluded that the administrator failed to "discuss" a letter from the plaintiff's treating physician. Although the administrator argued that the denial letter did discuss the letter, we "f[ou]nd the word 'discussed' is somewhat misleading; 'mentioned' would be a more accurate choice." *Glenn*, 461 F.3d at 671 n.3. Here the final determination letter simply lists the SSA decision as one item in a list of approximately ninety items "[i]ncluded in th[e] review." J.A. at 311-12 (Final Decision at 1-2).

[3] At the root of all of the defendants' SSA arguments is that *Glenn* was wrongly decided. *See* Defs.' Br. at 34-38. As *Glenn* is a published decision in our court, and therefore, binding precedent, we decline to entertain the defendants' arguments.

We have similar concerns in the case at bar. Although the policy gave the defendants the right to conduct a physical examination, the defendants opted to rely only on peer reviews of Bennett's files. J.A. at 135 (Plan). Our first concern is that, although both Cohan and Rose had access to the SSA's determination that Bennett was disabled and could not perform any job in the national economy, neither doctor made any mention of this fact in his file review, much less attempted to explain why he disagreed with the SSA's determination. This raises serious questions about the thoroughness and accuracy of these file reviews.

Second, as in *Calvert*, Cohan implies in his file review that Bennett is not credible, despite the fact that he had never physically examined her. J.A. at 346 (describing Bennett as "exaggerati[ng]" and "embellish[ing]" in her test performance). Cohan based this determination on notes from Bennett's treating physicians, but none of those physicians ever cited any concerns that Bennett was malingering. In fact Keenan's examination notes state quite the opposite: that Bennett's "profile is more suggestive of depression than frank malingering, which was corroborated by objective personality test results. Rather than a conscious attempt to feign cognitive symptoms for monetary secondary gain, [] Bennett presented as *having difficulties adjusting to and accepting the limitations associated with MS*." J.A. at 265 (Keenan Rpt.) (emphasis supplied). Although all of the file reviews key in on Keenan's finding that the neuropsychological test results demonstrated inconsistent effort, none of the file reviews explain that Bennett's inconsistent efforts on the tests were related to her difficulty in accepting and adjusting to MS.

Third, the final determination that Bennett was not disabled was based, in part, on inconsistent findings from Goldberg's file review. In 2001, Goldberg originally found that Bennett was not able to perform her own job. In his 2003 file review, he noted that Lisak indicated that Bennett had a Class 4 impairment, cannot stand or walk, can sit for only two hours a day, and cannot work, but Goldberg then concluded that Bennett does not have "a functional impairment that would preclude [her] from either doing her own job or working at any job, particularly in a sedentary capacity." J.A. at 321 (Goldberg Review at 4). Goldberg reached this conclusion without any explanation as to why he did not agree with Lisak's assessment.[4] To the extent that Goldberg agreed with Lisak's assessment, we fail to understand how a person who can sit for only two hours in an eight-hour work day and cannot stand or walk for any appreciable period of time could, nonetheless, work.

We conclude that the file reviews used in this case do not adequately explain why the reviewers reach decisions contrary to both the SSA and the medical evidence presented through the reports of Bennett's treating physicians. Instead, the file reviews summarize Bennett's medical records and then conclusorily assert that Bennett can work. Further, we will not credit a file review to the extent that it relies on adverse credibility findings when the files do not state that there is reason to doubt the applicant's credibility. Our concerns with the file reviews in this case weigh significantly in favor of a finding that the final decision was arbitrary or capricious.

### E. Broadspire's Determination Was Both Arbitrary and Capricious.

Our review of the record leads us to conclude that Broadspire's decision was not made as the result of "a deliberate, principled reasoning process." *Glenn*, 461 F.3d at 666. As we have discussed earlier in this opinion, the defendants assisted Bennett in obtaining disability benefits from the SSA, reaped financial benefits from this decision, and then Broadspire failed to explain why it reached a disability conclusion at odds with the SSA's findings. Similarly, the file reviews which

---

[4] The only indication we have that Goldberg discredits Lisak's conclusion is when Goldberg points out that although Lisak indicates that Bennett should never drive, Lisak also noted that Bennett had driven to her examination in June 2003. However, Goldberg, himself, states that a no-driving restriction would be a reasonable limitation to place on Bennett.

Broadspire relied upon in denying Bennett's claim offer no discussion about the SSA's disability determination.  We are also troubled by Broadspire's reliance on file reviews that imply that Bennett is not credible, when in fact, no one who actually examined Bennett reached that conclusion. Further, Broadspire's reliance on a file report that acknowledges that Bennett cannot walk or stand and can only sit for two hours and that conclusorily asserts that she can work in a sedentary capacity demonstrates a lack of principled reasoning.

We finally register our serious concern that the final denial letter fails to explain the reasons for its decision.  The three-page letter uses approximately one page to explain the standard for own-occupation disability.  The next page simply lists the approximately ninety documents which were included in the review of Bennett's claim.  The actual explanation of the decision-making process employed simply states that Broadspire did not believe that the submitted documents contained "sufficient medical evidence . . . to substantiate a significant functional impairment that would prevent[] [] Bennett from performing the essential functions of any occupation."  J.A. at 313 (Final Decision).  This reads like a conclusion, not a "deliberate, principled reasoning process . . . supported by substantial evidence."  *Glenn*, 461 F.3d at 666.  Accordingly, we hold that Broadspire's determination cannot withstand scrutiny under the "arbitrary or capricious" standard of review.

## III.  CONCLUSION

Because we conclude that the decision to deny benefits was not the result of a deliberate and principled reasoning process supported by substantial evidence, we **VACATE** the judgment of the district court and **REMAND** with instructions to remand to Broadspire for a full and fair review consistent with this opinion.

---

**CONCURRING IN THE JUDGMENT**

---

COOK, Circuit Judge, concurring in the judgment.  While decisions from this circuit accept that we must analyze this brand of ERISA cases under the arbitrary and capricious standard of review, in practice we seem to stray improperly from that standard in favor of a more searching one.  A handful of factors—such as supposedly contrary Social Security Administration (SSA) disability determinations, apparent conflicts of interest, and reliance on file reviews—colors our view of the administrators' decisions.  Our increased skepticism is unwarranted, and I write separately not to quibble over minor differences I might have with the majority's analysis, but rather to explain why these factors should be less relevant to our analyses of these cases.

*SSA Determinations*

Our court has succumbed to the unfortunate temptation of continuing to equate Social Security and private insurance disability determinations, despite the Supreme Court's clear and explicit warning not to do exactly that.  In 2003, this court joined the Ninth Circuit in importing the SSA's treating physician rule to ERISA cases, "requiring courts to defer to the opinions of a claimant's treating physicians unless there is substantial evidence contradicting them."  *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 532 (6th Cir. 2003).  The court approved Ninth Circuit language finding the treating physician rule to be a "common sense requirement," *id.* (quoting *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1143 (9th Cir. 2001)), but it failed to cite let alone explain the SSA regulation creating the treating physician rule, 20 C.F.R. § 404.1527(d)(2).  *Darland* certainly did not explain, because it could not, why ERISA bound private insurance companies to regulations promulgated to govern the administration of a public benefit.

The Supreme Court overturned the judicially created ERISA treating physician rule just four months after this court issued *Darland*.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).  Writing for a unanimous court, Justice Ginsburg emphasized that "critical differences between the Social Security disability program and ERISA benefit plans caution against importing a treating physician rule from the former area into the latter."  *Id.* at 832–33.  The Court further noted that even "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'"  *Id.* at 832.

*Darland* also adopted the Seventh Circuit's "penumbra rationale," holding that the principles of judicial estoppel, if not the doctrine itself, apply to cases where the insurance company helps the claimant successfully petition the SSA for disability benefits and yet later denies that claimant LTD benefits.  317 F.3d at 529–30.  One might think that the unanimous decision in *Black & Decker* explicitly overturning one aspect of *Darland* would give us pause as to the continuing vitality of the penumbra rationale.  The Supreme Court explicitly warned courts not to equate the ERISA and Social Security regulatory regimes.  *See Black & Decker*, 538 U.S. at 830 ("The United States urges that the Court of Appeals 'erred in equating the two [statutory regimes].'  We agree." (quoting the Solicitor General's amicus brief)).  But our *Glenn* decision inexplicably held that comparing the Social Security disability standard to the private standard under review "is all the more relevant in the wake of" *Black & Decker*'s holding that the treating physician rule "is not applicable in ERISA cases."  *Glenn v. MetLife*, 461 F.3d 660, 668 (6th Cir. 2006).

Rather than attempting to salvage the penumbra rationale, I would read the Supreme Court's holding in *Black & Decker* as denying support to the theoretical underpinnings of the penumbra rationale.  Comparing disability standards to find estoppel requires courts to effectively equate the

two statutory regimes, and that is exactly what the Supreme Court counsels us *against* doing. But even without *Black & Decker's* guidance, our court ought to distinguish between public and private "disability" determinations, for they are not the same.

### Conflicts of Interest

The majority here does not analyze whether Kemper and Broadspire were acting under a conflict of interest but many cases in our circuit do evaluate such conflicts.[1] This line of argument stems from Justice O'Connor's statement in a seminal 1989 ERISA decision: "Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)). As other circuits have noted, "courts have struggled to give effect to this delphic statement, and to determine both what constitutes a conflict of interest and how a conflict should affect the scrutiny of an administrator's decision to deny benefits." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 383 (3d Cir. 2000), *quoted by Denmark v. Liberty Life Assur. Co.*, 481 F.3d 16, 29 (1st Cir. 2007).

In this circuit, we typically find a structural conflict of interest exists any time the entity paying benefits is also responsible for administering claims. *See Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991). It is not obvious to me why this must always be so, and other circuits have held that there is not an automatic conflict of interest in such situations. *See, e.g.*, *Davolt v. Executive Comm. of O'Reilly Auto.*, 206 F.3d 806, 809 (8th Cir. 2000). ERISA was intended to govern the administration of private benefit plans, *see* 29 U.S.C. § 1001, and it seems odd to assume that companies would establish disability benefit plans only to deny benefits whenever possible. *See Denmark*, 481 F.3d at 29–30. We can safely assume that the employee's interest is always to receive benefits when she asks for them. But we cannot assume the employer's interest is to always deny benefits, which if true would greatly reduce the value of the benefit as an overall part of the employee's compensation. And if that value were reduced, employees might seek additional compensation in other forms. It may, and often will, be in the employer's *financial* interest to grant LTD benefits in some cases, especially the meritorious ones. I think we err, and misinterpret Justice O'Connor's statement, when we create a structural conflict of interest based on the simplistic economic assumption that employers' and employees' interests will inevitably conflict.

### File Reviews

Our circuit also seems troubled when administrators decline to have the claimant independently examined, *see, e.g.*, *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006); *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 509 (6th Cir. 2005); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005), even though we find "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," *Calvert*, 409 F.3d at 296. The Seventh Circuit recently found no

> authority that generally prohibits the commonplace practice of doctors arriving at professional opinions after reviewing medical files. In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation. It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations.

---

[1] As the majority opinion recognizes, the Supreme Court recently granted certiorari to review this issue in *Glenn v. MetLife*, 461 F.3d 660 (6th Cir. 2006), *cert. granted*, 76 U.S.L.W. 3017 (U.S. Jan. 18, 2008) (No. 06-923).

*Davis v. Unum Life Ins. Co.*, 444 F.3d 569, 577 (7th Cir. 2006). It is odd to suggest that an administrator acts improperly by following standard practice in the health insurance industry, and I would follow the Seventh Circuit in not penalizing administrators who base their decisions on their experts' file reviews.

Writing on a clean slate, I would not hold that the administrator's decision was arbitrary and capricious. I cannot say that Bennett was deprived of the kind of contractually bargained-for benefit that ERISA was enacted to protect. But being bound by Sixth Circuit precedent until the Supreme Court or the en banc court rules otherwise, I concur in the judgment.