NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0673n.06

No. 15-3470

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Dec 15, 2016
DEBORAH S. HUNT, Clerk

JACK B. CALHOUN, JR., )
)
  Plaintiff-Appellant, )
)
v. )
)  ON APPEAL FROM THE UNITED
)  STATES DISTRICT COURT FOR THE
LIFE INSURANCE COMPANY OF )  SOUTHERN DISTRICT OF OHIO
NORTH AMERICA, )
)
  Defendant-Appellee. )
)

BEFORE:  DAUGHTREY, ROGERS, and WHITE, Circuit Judges.

  MARTHA CRAIG DAUGHTREY, Circuit Judge. The plaintiff, Jack Calhoun, Jr., filed this Employee Retirement Income Security Act (ERISA) action against defendant Life Insurance Company of North America (LINA) after the insurance company terminated his long-term disability benefits. In deciding to end Calhoun's benefits, LINA concluded that Calhoun was no longer "totally disabled," which was a prerequisite to Calhoun's receipt of disability benefits under the insurance plan. The district court upheld LINA's determination, finding that under the deferential arbitrary-and-capricious standard of review, LINA's termination of benefits was not arbitrary and capricious. For the reasons set out below, we conclude that LINA's decision to terminate Calhoun's benefits was not the product of reasoned decision-making and was not supported by substantial evidence. Therefore, we hold that LINA acted arbitrarily and capriciously when it denied Calhoun's claim, and we reverse the judgment of the district court and remand the case for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

As a senior maintenance technician at Mars, Inc., Calhoun "[r]an a team of technicians to repair & maintain factory equip[ment]." Calhoun, however, stopped working in January 2010 due to chronic leg and back pain that was aggravated by sitting, standing, and walking. Dr. Monique Boezi, Calhoun's primary-care physician, summarized Calhoun's symptoms:

> Any walking hurts [Calhoun's] back. . . . . If he stands for any leng[th] of time, about 10 minutes[,] he has to use a cane o[r] sit down . . . . His legs go numb when he sits for longer than 20-30 minutes . . . . All of these symptoms are daily and really affect his normal living . . . . [H]e cannot walk, stand, or sit for prolonged periods of time.

Dr. Boezi's treatment notes consistently reflected Calhoun's inability to sit or stand for prolonged periods of time, leading her to conclude that Calhoun could not work in his job as a maintenance technician because it required "a lot of walking and lifting and bending with prolonged standing," but also that he could not work at a desk job, which required long periods of sitting. Electromyography confirmed that Calhoun suffered from meralgia paresthetica, a compression of a nerve in the thigh, and an MRI revealed degenerative disc disease at L5-S1, a vertebral segment at the base of the spine.

In addition to his primary-care appointments with Dr. Boezi, Calhoun regularly saw Dr. Nancy Vaughan, an orthopedic specialist, for treatment of his condition. Dr. Vaughan reported that Calhoun could not stand for longer than 20 minutes and noted Calhoun's difficulties with walking, but she declined Calhoun's request for a power scooter, explaining that "[t]he sedentary lifestyle is more harmful to his health." Dr. Vaughan wrote in her treatment notes that she thought Calhoun was "limiting his function more than he should be" and that his pain was "out of proportion to objective findings." Calhoun also saw several other specialists: Dr. Robert Dixon, a neurosurgeon, who confirmed that Calhoun's symptoms were consistent with

Drs. Boezi and Vaughan's diagnoses; Dr. Robert Stephenson, a physical medicine and rehabilitation specialist, who opined that it was unlikely that Calhoun's spine was the cause of pain "so severe that [Calhoun] must use a motorized scooter"; and Dr. James Powers, another physical medicine and rehabilitation specialist, who opined that it was more likely that Calhoun's pain was musculoskeletal rather than neurological.

After exhausting his short-term disability leave, Calhoun submitted a disability claim under Mars's long-term disability plan. The plan, administered by LINA, provided monthly benefits payments to employees with a "total disability." An employee was defined as "totally disabled" if, during an initial 24-month period, he was "unable to perform all the essential duties of his occupation." After that 24-month period, an employee was "totally disabled" only if "he [was] unable to perform all the essential duties of any occupation" for which he was reasonably qualified and also "remain[ed] unable to earn more than 75% of his Basic Monthly Earnings." LINA both determined which claims were eligible for benefits under the plan and paid the benefits for eligible claims.

While his claim before LINA was pending, Calhoun applied for Social Security benefits with the assistance of LINA, which arranged and paid for Calhoun's representation before the Social Security Administration (SSA). The plan stipulated that if the employee refused LINA's assistance with the SSA claim, then the employee's monthly payments would be reduced by the amount of benefits that the employee would be "assumed to receive" from the SSA for his disability. If the employee cooperated with LINA's assistance with the SSA claim, as Calhoun did, then his monthly payments would not be reduced by the assumed receipt of SSA] benefits. Under the terms of the plan, if his SSA claim was successful, the employee was required to reimburse LINA for any overpayment in his monthly benefits.

In July 2010, LINA notified Calhoun that he satisfied the plan's definition of total disability, and LINA approved Calhoun's claim for long-term disability benefits approximately one month later. LINA informed Calhoun that LINA would continue to monitor his claim, with subsequent payment of benefits contingent upon "confirmation of [his] continuing disability-status." Calhoun's long-term disability benefits commenced on July 26, 2010. To document Calhoun's level of daily activity, LINA arranged for video surveillance of Calhoun over a three-day period in March 2011. The surveillance company, PhotoFax, Inc., reported that it had obtained nine minutes of film of Calhoun "walking, talking, driving, entering and exiting his vehicle, pushing a shopping cart, and carrying bags of groceries" and 13 minutes of film of Calhoun "sitting down and pushing a shopping cart through a store."

After Calhoun had received 15 months of benefits payments, LINA reminded him that, consistent with the benefits plan, he would receive benefits beyond the initial 24-month period only if he was "unable to perform all the material duties of any occupation" for which he reasonably could be qualified. LINA informed Calhoun that it would review his claim to determine his continued eligibility for benefits. In addition to reviewing the medical records from his treating physicians, LINA arranged for Calhoun to be evaluated through a functional-capacity analysis, additional video surveillance, transferrable-skills analysis, and peer review of Calhoun's medical file.

In March 2012, occupational therapist Scott Secrest conducted a functional-capacity analysis of Calhoun. Secrest observed that Calhoun could lift or carry certain amounts of weight occasionally but that he could not carry even negligible weight frequently. Secrest further observed that Calhoun "exhibit[ed] limited tolerance for sustained sitting or standing" and "limited tolerance for various mobility tasks such as walking, stooping, kneeling and climbing

stairs, each of which he [was] able to perform on no more than an occasional basis." Secrest concluded that Calhoun would "require at least one break every hour for 5-10 minutes from sustained sitting" and that he could not tolerate standing for more than 15-20 minutes without a break.

To supplement the functional-capacity analysis, LINA engaged PhotoFax for a second round of video surveillance of Calhoun. Over the three-day period in which Calhoun was photographed, PhotoFax obtained approximately three minutes of film of Calhoun "walking, entering and exiting a vehicle, driving, slightly leaning, and using his right hand and arm to open a vehicle door." PhotoFax reported that Calhoun "performed these activities while walking in a slow manner." Based on the functional-capacity analysis and the second round of video surveillance, LINA conducted a transferrable-skills analysis to assess whether there were any jobs consistent with Calhoun's physical capacity. This analysis concluded that "transferability could not be identified" because of Calhoun's "demonstrated restriction to occasional standing and walking." On March 19, 2012, LINA informed Calhoun that LINA had completed its review and that Calhoun's benefits would continue beyond the 24-month period.

In April 2012, Calhoun was awarded Social Security benefits for his disability. In finding that Calhoun was disabled within the meaning of the Social Security Act, an administrative law judge (ALJ) based his conclusion on, among other things, the functional-capacity analysis, the MRI, physician treatment notes, testimony from a vocational expert, and statements from Calhoun regarding "the intensity, persistence and limiting effects" of his condition, all of which the ALJ found "generally credible." The judge determined that the objective medical evidence established that Calhoun had some residual-functional capacity but found that Calhoun's limitations precluded his ability to perform light work. The ALJ

concluded, "I find the claimant's additional limitations so narrow the range of work he might otherwise perform that a finding of 'disabled' is appropriate." After learning of Calhoun's Social Security benefits award, LINA reduced Calhoun's monthly benefits and, for reimbursement purposes, calculated the amount that Calhoun had been overpaid.

Despite the findings of the ALJ, LINA conducted an exploratory transferrable-skills analysis during the following month, in order to identify sedentary occupations available to Calhoun. This analysis noted that "updated limitations and restrictions would be required" for a formal transferrable-skills analysis. LINA therefore arranged for PhotoFax to conduct a third round of video surveillance of Calhoun's daily activities. After surveilling Calhoun for three days, PhotoFax reported that it had obtained approximately 18 minutes of film of Calhoun "as he walked, stood from sitting/laying/and kneeling positions without assistance on multiple occasions, walked with a walker at a [store]" and lay on his back as he worked on a lawnmower, among other things. PhotoFax reported that Calhoun "appeared to perform these activities in a fluid and unrestricted manner, without the use of any assistive devices."

LINA then engaged Dr. David Trotter, an orthopedic surgeon, to conduct a peer review of Calhoun's medical file. In his report, Dr. Trotter wrote, "The available documentation including surveillance video supports that the observed activities of daily living are inconsistent with the claimant's self-reported limitations and overall self reported dysfunction." Dr. Trotter rejected the conclusions of the March 2012 functional-capacity analysis, stating that "the objective findings are not commensurate with the rather inexplicable findings/lessor functionality evident within the [analysis]." Dr. Trotter clarified in an addendum to his report that "there is no credible evidence indicating this claimant is unable to perform full time sedentary or light level work." Dr. Trotter's review did not include a physical examination of Calhoun.

Shortly after receiving Dr. Trotter's report, LINA requested a second transferrable-skills analysis to determine whether there were jobs within Calhoun's physical capacity. This analysis was "based solely on restrictions and limitations cited by Dr. Trotter" in his peer-review report and addendum. The analysis concluded that Calhoun would be able to perform "sedentary or light work classification occupations" and identified four of them: maintenance supervisor, preventive maintenance coordinator, electric-meter repairer, and an inside-meter tester.

Two days after the second transferrable-skills analysis, LINA informed Calhoun that it was terminating his long-term disability benefits. LINA noted that it had reviewed, among other things, Calhoun's disability questionnaire, Dr. Boezi's medical records of Calhoun's treatment, the March 2012 functional-capacity analysis, the March and September 2012 surveillance videos, and Dr. Trotter's peer-review report and addendum. LINA noted that it had considered the fact that Calhoun was awarded Social Security benefits but asserted that it was "in receipt of more recent information than the SSA had to consider at the time of its decision." Although LINA did not identify this "more recent information," LINA explained that its conclusion that Calhoun "retain[ed] the capacity to perform full-time Sedentary-Light work" was "[b]ased on [Dr. Trotter's] Peer Review results," that the transferrable-skills analysis "identified several transferable Light occupations" and that the "surveillance provided some insight into [Calhoun's] functionality." LINA determined that Calhoun was *not* totally disabled and terminated his benefits on October 19, 2012.

Calhoun appealed the termination of his benefits through LINA's internal review process. In considering Calhoun's appeal, LINA engaged Dr. Elena Antonelli to conduct a second peer review. Dr. Antonelli reviewed Calhoun's medical file and the three sets of surveillance videos, and she discussed Calhoun's "history, [functional-capacity analysis] results, and the surveillance

video" with Dr. Boezi. In her report, Dr. Antonelli wrote that she and Dr. Boezi "agreed that [Calhoun] needs restrictions but is not totally impaired." Dr. Antonelli also said that the March 2012 functional-capacity analysis "may have been somewhat unreliable but likely reflects the minimum abilities of [Calhoun]," and she concluded, "Based on the totality of his conditions, [Calhoun] likely requires some restrictions on his activities but he is likely to be able to perform as the [functional-capacity analysis] indicated. He is also capable of driving an automobile and can work 8 hours per day and 40 hours per week." LINA then conducted a third transferrable-skills analysis. This analysis was based on Dr. Antonelli's peer-review report and the functional-capacity analysis. The transferrable-skills analysis identified three jobs consistent with Calhoun's capability: maintenance scheduler, maintenance superintendent, and order-takers supervisor.

On June 11, 2013, LINA denied Calhoun's appeal. In its letter informing Calhoun of the denial, LINA stated that it had reviewed Calhoun's entire file, including the favorable SSA determination and determined that "the weight of the evidence in [Calhoun's] claim file supports his ability to perform the material duties of any occupation." In the section of its letter explaining its rationale for terminating Calhoun's benefits, LINA summarized Dr. Antonelli's peer-review report and the third transferrable-skills analysis. LINA also noted that it was "in receipt of more current medical information than the [SSA] had at the time of their initial determination," but did not specify the information to which it was referring.

All in all, Calhoun received long-term disability benefits for 27 months, from July 26, 2010, through October 25, 2012. Convinced that LINA terminated his benefits wrongfully, Calhoun sued LINA in district court under ERISA, 29 U.S.C. §§ 1001–1461, seeking their

reinstatement. Both parties moved for judgment on the administrative record, and the district court found in favor of LINA. From that ruling, Calhoun now appeals.

## DISCUSSION

We review *de novo* the district court's judgment on the administrative record. *Bennett v. Kemper Nat. Services, Inc.*, 514 F.3d 547, 552 (6th Cir. 2008). However, if, as here, the benefits plan gives the plan administrator discretionary authority to determine eligibility for benefits, we review a decision to deny benefits using the arbitrary-and-capricious standard of review. *Id.* Under this standard, "we uphold the administrator's decision if it is the result of a deliberate, principled reasoning process and it is supported by substantial evidence." *Id.* (internal quotation marks and citation omitted). Though this standard is deferential, "our review is no mere formality." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd*, 554 U.S. 105 (2008). In reviewing under this standard, we do not "merely . . . rubber stamp the administrator's decision. Instead, we are required to review the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id.* (internal marks and citation omitted).

In considering whether the decision to terminate benefits was arbitrary and capricious, "we also factor in whether there existed a conflict of interest, whether the plan administrator failed to give consideration to the Social Security Administration's determination that the applicant was totally disabled, and whether the plan administrator based its decision to deny benefits on a file review as opposed to conducting a physical examination of the applicant." *Bennett*, 514 F.3d at 552-53 (internal marks omitted) (citing *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005)). These considerations do not alter the standard of review, but rather factor into our analysis whether the plan administrator's decision was arbitrary and capricious. *Id.*

**Conflict of Interest**

A conflict of interest exists for ERISA purposes when the plan administrator both evaluates claims—*i.e.*, determines which claims are covered under the benefits plan—and pays those claims. *Glenn*, 554 U.S. at 114; *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009). The existence of a conflict is "a factor in determining whether the plan administrator has abused its discretion in denying benefits," with the significance of the conflict varying according to the circumstances of the case. *Glenn*, 554 U.S. at 108. 114. For example, the conflict of interest may act as a "tiebreaker when the other factors are closely balanced," or it may "prove more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* at 117.

Here, LINA had a conflict of interest because it both determined whether claimant was eligible for benefits under the plan and also paid out the benefits. Moreover, because LINA took "seemingly inconsistent positions [that] were both financially advantageous" by assisting Calhoun with his receipt of SSA benefits and yet failing to address the SSA award adequately in terminating his benefits claim, we are justified "in giving more weight to the conflict." *See id.* at 118.

**Social Security Administration's Favorable Determination**

LINA's treatment of the SSA's disability determination weighs in favor of concluding that LINA acted arbitrary and capriciously when it terminated Calhoun's benefits. "[I]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and

capricious." *Bennett*, 514 F.3d at 554. Although the SSA determination is not binding, it is "far from meaningless," and, at a minimum, it indicates that the ALJ found objective support for the claim of disability. *Calvert*, 409 F.3d at 294.

LINA argues that it "never interfered . . . with the . . . position Calhoun took before the [SSA] regarding his ability to work," that it "did not receive the bulk of the benefit from Calhoun's success," and that it did, in fact, address the SSA determination in its letter terminating Calhoun's benefits. We find these arguments unconvincing. First, even if LINA never assisted with Calhoun's arguments or strategy before the SSA, it certainly encouraged Calhoun to apply for Social Security benefits through its "Social Security Assistance Program." As part of this program, LINA not only arranged and paid for Calhoun's representation before the SSA but also would have penalized Calhoun by reducing his benefits if he had not pursued a SSA claim.

Second, LINA argues that it "received no net-benefit from the Social Security Award" because the plan allowed LINA to reduce Calhoun's monthly benefits by his assumed Social Security award if he did not pursue the SSA claim. However, LINA also benefited financially when Calhoun pursued Social Security benefits and won, because LINA's monthly payments to Calhoun were reduced by the amount of the Social Security award. And, if Calhoun had sought Social Security benefits and been denied, LINA would not have been able to reduce its monthly payments to him. *See Glenn*, 461 F.3d at 667; *see also Calvert*, 409 F.3d at 294.

Third, LINA argues that the record indicates that it *did* consider the SSA award when it made the decision to terminate Calhoun's benefits. However, LINA's sole mention of the SSA award in its denial letters was to note that it had considered the award but rejected it because LINA was "in receipt of more current medical information than the [SSA] had at the time of

their initial determination." LINA failed to identify the "more current medical information" on which it relied in reaching a contrary decision and also failed to explain why this information warranted the conclusion that Calhoun was not totally disabled. "[M]ere mention of the [SSA] decision is not the same as a discussion about why the administrator reached a different conclusion from the SSA." *Bennett*, 514 F.3d at 553 n.2. To the extent that LINA was referring to the medical evidence that post-dates the favorable SSA determination, LINA failed to explain why that evidence should be credited over the other evidence in the record. Moreover, for the reasons discussed below, the evidence post-dating the SSA decision—the Trotter and Antonelli peer reviews, the additional video surveillance, and the second and third transferrable-skills analyses—is *not* substantial evidence supporting the conclusion that LINA's decision was the result of a deliberate, principled reasoning process.

**File Reviews by Dr. Trotter and Dr. Antonelli**

LINA's reliance on file reviews in denying Calhoun's claim also weighs in favor of finding that LINA's decision was arbitrary and capricious. We have repeatedly raised concerns regarding file reviews when the reviewing physician makes a conclusion as to the claimant's credibility without ever physically examining him. *See, e.g.*, *Calvert*, 409 F.3d at 295. Although "there is nothing inherently improper with relying on a file review[,] . . . [w]here . . . the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate." *Id.* at 297 n.6. Here, Dr. Trotter did not physically examine Calhoun as part of his review, but he nevertheless concluded that "there is no credible evidence indicating [Calhoun] is unable to perform full time sedentary or light level work."

Dr. Trotter's file review is also concerning for several other reasons. He nowhere explained why he believed that the medical evidence did not support Calhoun's claim; instead, Dr. Trotter summarized the evidence and baldly asserted that "the observed activities of daily living are inconsistent with the claimant's self-reported limitations and overall self reported dysfunction." Nor did Dr. Trotter explain his reasons for not crediting the March 2012 functional-capacity analysis; he merely restated verbatim the conclusion from the evaluation, noted that the MRI and electromyography reflected degenerative disc disease and meralgia paresthetica, and then asserted that "the objective findings are not commensurate with the rather inexplicable findings/lessor functionality evident within the [functional capacity analysis]." Dr. Trotter nowhere discussed the SSA disability determination, perhaps because he was not aware of it and so did not review it.[1] Despite these deficiencies, LINA nonetheless relied on Dr. Trotter's review in deciding to terminate Calhoun's disability benefits.

Dr. Antonelli's file review, which LINA requested to assist with its review of Calhoun's appeal to LINA, is similarly inadequate. In her report, Dr. Antonelli stated that the March 2012 functional-capacity analysis "likely reflects the minimum abilities of [Calhoun]" and concluded that Calhoun was "capable of driving an automobile and can work 8 hours per day and 40 hours per week." Dr. Antonelli, however, did not physically examine Calhoun. It also is unclear how the evaluation's findings, which concluded that Calhoun would "require at least one break every hour for 5-10 minutes from sustained sitting" and could stand for only 15-20 minutes, would justify the conclusion that Calhoun could work on a full-time basis. Although Dr. Antonelli said in her report that she and Dr. Boezi, Calhoun's primary-care physician, agreed that Calhoun was "not totally impaired," that statement does *not* mean that they also agreed as to whether Calhoun

---

[1] The record indicates that the SSA determination was not listed as part of the materials that Dr. Trotter reviewed.

was physically capable of working a full-time job.[2]  Dr. Antonelli also did not discuss the SSA award—again, perhaps because she was unaware of it.  Despite these deficits, LINA nonetheless gave significant weight to Dr. Antonelli's file review in deciding to deny Calhoun's appeal.

LINA's reliance on the file reviews raises additional concerns because under the benefits plan, LINA reserved the right to conduct physical examinations of claimants.  We have repeatedly found that "the failure to conduct a physical examination though the benefits plan explicitly reserves that right raises questions about the thoroughness and accuracy of the benefits determination."  *See, e.g.*, *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 550 (6th Cir. 2015) (citation and internal quotation marks omitted).  Particularly because LINA was subject to a conflict of interest, LINA's decision to utilize file reviews and forego a physical examination, its reliance on the file reviews despite the inadequacies with the reviews, and its failure to explain why it was crediting the file reviewer opinions over that of a treating physician collectively weigh in favor of finding that LINA's denial of Calhoun's claim was arbitrary and capricious.  *See Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013) (discounting a file review "when the plan administrator, without any reasoning, credits the file reviewer's opinion over that of a treating physician"); *see also Bennett*, 514 F.3d at 555; *see also Calvert*, 409 F.3d at 296-97.

**Other Evidence**

In addition to the Trotter and Antonelli file reviews, in the letter terminating Calhoun's disability benefits, LINA also cited:  the transferrable-skills analyses conducted shortly after those reviews (from October 2012 and from June 2013); the third round of video surveillance in

---

[2] Indeed, the record suggests that Dr. Boezi would *not* have agreed that Calhoun had the physical capacity to work at a full-time job.  Dr. Boezi stated in her treatment notes that Calhoun could *not* work in the job that he had at Mars or in a desk job.  In the most recent treatment note from Dr. Boezi in Calhoun's medical file, Dr. Boezi wrote that Calhoun was "having a hard time standing or sitting for too long[.]  [H]e has to lay down.  If he pushes it[,] he can be down for a few days."

September 2012; and Dr. Boezi's notes from Calhoun's July 23, 2012, visit. All of this evidence was either discredited or inadequate to explain the termination of Calhoun's benefits.

First, the transferrable-skills analyses should be discounted because they were based solely on the Trotter and Antonelli file reviews.[3] Given that the file reviews were inadequate to explain the termination, the transferrable-skills analyses based on the conclusions from those file reviews must also be considered inadequate. Second, though Dr. Trotter and LINA attributed significant weight to the video surveillance because it depicted Calhoun performing various mobility tasks,[4] the video surveillance is not inconsistent with Calhoun's reported limitations on his mobility, nor does it demonstrate that Calhoun is capable of working on a full-time basis. As the district judge explained:

> While some of the footage contradicts Plaintiff's testimony regarding his limitations, reliance on the footage in terminating benefits raises several concerns. Indeed, in six days of surveillance, PhotoFax viewed a total of less than thirty minutes of notable activity, that being Plaintiff standing from lying, kneeling and sitting positions in a fluid manner without the use of any assistive devices. Everything else observed is consistent with what he reported—driving, laying down, using his arms, using a walker, standing for ten to fifteen minutes. The fact that Plaintiff was able to move fluidly over the course of less than thirty minutes provides little support for a finding of capacity to perform full time light or sedentary work.

Third, LINA's citation to Dr. Boezi's notes from Calhoun's visit on July 23, 2012, is misleading. LINA stated in its letter terminating Calhoun's benefits that Calhoun reported

---

[3] The second transferrable-skills analysis stated that it was "based solely on restrictions and limitations cited by Dr. Trotter" in his peer review report and addendum. The third transferrable-skills analysis stated that it was "based on the [Dr. Antonelli] peer review and [functional-capacity analysis] dated 03/12/2012." The third transferrable-skills analysis, however, did not give any indication that it reviewed the functional-capacity analysis: it repeated only Dr. Antonelli's summary of the functional-capacity evaluation and did not list the evaluation as one of the documents that was reviewed in preparing the transferrable-skills analysis.

[4] In explaining its termination of Calhoun's benefits, LINA wrote to Calhoun: "While under surveillance, you were active and were observed driving, sitting, standing, walking, laying on your back, kneeling, bending, reaching, welding a mowing deck on a lawnmower, performing maintenance on a lawnmower, shopping and conversing with individuals . . . . Of note, the only time you utilized a walker and/or carried a cane was at the [functional-capacity analysis] and when you went shopping at Lowe's."

"increased tingling and numbness in [his] bilateral lower extremeties" during that visit, but that Dr. Boezi "recorded a normal exam and discussed with you that weight loss could help improve your chronic back and leg pain." However, in her notes from that visit, Dr. Boezi, did not challenge Calhoun's symptoms, nor did she indicate that Calhoun was capable of returning to work. To the contrary, in her July 23 treatment notes, Dr. Boezi stated that Calhoun could not "stand[] for too long" and concluded that Calhoun's chronic leg and back pain was "not improving."

LINA argues that the March 2012 functional-capacity analysis also supported its decision to terminate Calhoun's benefits because it found that Calhoun was capable of working in a sedentary capacity. The functional-capacity analysis, however, nowhere stated that Calhoun was capable of working in a sedentary capacity; indeed, the evaluation concluded that Calhoun "exhibit[ed] limited tolerance for sustained sitting or standing." Although a physical-ability assessment accompanying the functional-capacity analysis indicated that Calhoun could sit "frequently: 2.5-5.5 hrs/day, 1/3-2/3 of the day," Calhoun's capacity to sit frequently does not establish that he can work on a full-time basis. Indeed, the transferrable-skills analysis completed shortly thereafter, which was based on the functional-capacity analysis and the physical-ability assessment, concluded that there were no available jobs consistent with Calhoun's capacity because of his "demonstrated restriction to occasional standing and walking."

In support of its decision to terminate Calhoun's benefits, LINA also argues that Drs. Vaughan and Stephenson, both of whom examined Calhoun, stated that Calhoun's expressed level of pain was not consistent with the objective medical evidence.[5] In her notes from a

---

[5] In its brief, LINA also included "Dr. Bowers" as an examining physician who "questioned [Calhoun's] failure to return to work and the extent of his self-reported limitations." Presumably LINA means Dr. Powers, a neurologist whom Calhoun saw for a consultation. However, Dr. Powers did not question Calhoun's symptoms: he stated only that the source of Calhoun's pain was likely musculoskeletal rather than neurological.

January 2011 visit, Dr. Vaughan stated that she thought Calhoun should not use a motorized scooter because he was "limiting his function more than he should be" and concluded that Calhoun's pain was "out of proportion to objective findings." In June 2011, Dr. Stephenson wrote, "Calhoun is reporting chronic low back pain and lower limb paresthesia, sometimes so severe that he must use a cane or motorized scooter. Based on his clinical exam and diagnostic workup I do not have an explanation for this, from a physical medicine perspective."

Though these comments should be given some weight because Drs. Vaughan and Stephenson *did* physically examine Calhoun, their comments are not inconsistent with the conclusion that Calhoun's condition precluded him from working a full-time job; rather, their comments suggest only that Calhoun's pain did not require a scooter. And, to the extent Drs. Vaughan and Stephenson were expressing skepticism regarding Calhoun's symptoms, the medical record reflects extensive notes from Dr. Boezi that consistently report, even after Drs. Vaughan and Stephenson's examinations of Calhoun, that Calhoun could not sit or stand for prolonged periods of time without experiencing numbness or pain.

In terminating Calhoun's benefits, however, LINA failed to explain why it was crediting these notes from Drs. Vaughan and Stephenson over those of Dr. Boezi. LINA's attempted reliance on Drs. Vaughan and Stephenson's comments as justification for terminating Calhoun's benefits is even more troubling because the SSA judge found, based upon the same evidence, that "the medical evidence of record supports [Calhoun's] testimony . . . [and that] the claimant's subjective complaints and alleged limitations are persuasive . . . ."[6] At the very least, LINA should have given its reasons for rejecting the opinion of Dr. Boezi and the determination of the ALJ. *See Shaw*, 795 F.3d at 548-49 ("A plan may not reject summarily the opinions of a treating

---

[6] The administrative law judge did not discuss these notes from Drs. Vaughan and Stephenson in his decision. However, it appears that both were included in the SSA file.

physician, but must instead give reasons for adopting an alternative opinion.") (citation and internal quotation marks omitted).

For similar reasons, the district court found "troubling several aspects of LINA's review of [Calhoun's] claim," but nevertheless found in favor of LINA because it felt "constrained by the extremely deferential arbitrary and capricious standard." This deferential standard of review, however, does not serve as a "rubber stamp" for the plan administrator's decision. *See Glenn*, 461 F.3d at 666. For the foregoing reasons, and particularly because of LINA's conflict of interest, we conclude that LINA's termination of Calhoun's disability benefits was *not* the result of a deliberate, principled reasoning process that was supported by substantial evidence. We therefore hold that LINA acted arbitrarily and capriciously when it denied Calhoun's claim.

**Remedy**

Next, we must consider the appropriate remedy: whether to remand to LINA for reconsideration of Calhoun's claim or to award benefits directly to Calhoun. "[W]here the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled, the appropriate remedy generally is remand to the plan administrator." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007) (quoting *Elliott v. Metro Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006)). However, where the claimant clearly is entitled to disability benefits, we have awarded benefits to the claimant without remand to the plan administrator. *Shaw*, 795 F.3d at 551; *see also Cooper*, 486 F.3d at 171. As we have explained, "Plan administrators should not be given two bites at the proverbial apple where the claimant is clearly entitled to disability benefits. They need to properly and fairly evaluate the claim the first time around; otherwise they take the risk of not getting a second chance, except in cases where the adequacy of claimant's proof is reasonably debatable."

*Cooper*, 486 F.3d at 172. Accordingly, we have awarded the claimant benefits where objective medical evidence clearly established the claimant's disability, even in circumstances where the plan administrator's decision-making process "was unquestionably flawed." *Shaw*, 795 F.3d at 551; *see also Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 763 F.3d 598, 609 (6th Cir. 2014).

Here, objective medical evidence supported Calhoun's disability. Calhoun's electromyography and MRI reflected meralgia paresthetica and degenerative disc disease at L5-S1. The functional-capacity analysis, which "is objective evidence of a claimant's disability," *Shaw*, 795 F.3d at 552 (internal quotation marks omitted), detailed Calhoun's limited tolerance for standing and sitting. The SSA judge, too, concluded that Calhoun was disabled because his capacity for work was "so narrow." Calhoun's primary-care physician, Dr. Boezi, concluded that Calhoun "can't do a desk job due to the fact he can't sit for any length of time." All of Calhoun's other examining physicians—Drs. Vaughan, Dixon, Stephenson, and Powers—agreed that Calhoun's symptoms were consistent with meralgia paresthetica and degenerative disc disease. The only credible evidence against finding that Calhoun was disabled is Drs. Vaughan and Stephenson's remarks questioning whether Calhoun's pain required the use of a motorized scooter. But, neither Dr. Vaughan nor Dr. Stephenson questioned Calhoun's diagnoses, and neither opined as to whether Calhoun could work at a sedentary occupation on a full-time basis. Because LINA produced no credible evidence that undermined the objective medical evidence that clearly established Calhoun's disability, we remand this case to the district court for reinstatement of Calhoun's disability benefits from the date that they were terminated.

**CONCLUSION**

Because the record establishes that LINA acted arbitrarily and capriciously in denying Calhoun long-term disability benefits, we REVERSE the district court's judgment and REMAND this case to the district court for entry of an order in conformity with this opinion.

ROGERS, Circuit Judge, dissenting.

I would affirm for the reasons given in the district court's thorough and balanced opinion.

Even assuming that the district court on balance abused its discretion in this close case, I would direct the district court to remand to LINA, so that LINA could more directly address the SSA award, and so that LINA could obtain a further file review by a physician who has physically examined Mr. Calhoun. Under our test for the proper remedy as described in *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007), the primary reasons for the majority's finding of an abuse of discretion go to "the integrity of the plan's decision-making process," and not to show that Mr. Calhoun was "clearly entitled" to benefits.